# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BERNARD WAITHAKA, Individually and On
Behalf of All Others Similarly Situated,

Plaintiff,

v.

AMAZON.COM, INC. and AMAZON
LOGISTICS, INC.,

Defendants.

CIVIL ACTION NO. 4:18-CV-40150-TSH

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO TRANSFER OR STAY

## I.   <u>INTRODUCTION</u>

This case is a bit of déjà vu.  As this Court learned during the remand proceedings, there is an FLSA case (*Rittmann*) pending in the Western District of Washington that purports to cover Plaintiff Waithaka ("Waithaka" or "Plaintiff").  Indeed, the *Rittmann* plaintiffs are represented by the same counsel as Waithaka and, before filing the instant case, Waithaka's counsel originally advised Amazon that Waithaka had signed a consent to opt into the *Rittmann* case.  But after Judge Coughenour in Washington dismissed 7 of 8 counts in *Rittmann*, Waithaka hedged his risk by filing this action.   In the meantime, Waithaka's counsel filed an amended complaint in Washington, which continues to encompass an FLSA class that would include Waithaka.  And currently pending in *Rittmann* is precisely the issue presented here:  Should Delivery Partners who, like Waithaka, agreed to arbitrate be compelled to fulfill that promise?

In *Rittmann*, the plaintiffs never suggested that the governing Independent Contractor Terms of Service ("TOS") failed to clearly and conspicuously notify Delivery Partners of the agreement to arbitrate.  Nor could they.  At least 10 paragraphs call attention to the agreement. The first notice is on page 1, set off by capital letters and bold font. The agreement is unambiguous, mutual, and fair.  Among other terms, the TOS caps arbitration fees payable by a claimant at $200, less than the cost to file a complaint in Massachusetts. Waithaka scrolled through the entire TOS and clicked "I AGREE AND ACCEPT" *twice*, including once specifically agreeing to arbitration.

As Plaintiff's counsel did not argue unconscionability in *Rittmann*, Amazon does not anticipate that will be an issue here either.  In any event, it is well-settled that electronic app-based agreements such as the TOS are enforceable.  *Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284 (D. Mass. 2016), *aff'd* No. 16-2109, 2019 WL 1146759, at *1-2 (1st Cir. Mar. 13, 2019) (compelling arbitration under app-based agreement); *Wickberg v. Lyft, Inc.*, 356 F. Supp. 3d 179, 184 (D. Mass.

2018) (driver "entered into a valid arbitration agreement…by affirmatively assenting to reasonably communicated terms" and finding claims within "all disputes and claims" clause).

Nor is there any question that Plaintiff's claims fall within the scope of the agreement. *See, e.g.*, *Peterson v. Binnacle Capital Servs. LLC*, No. CV 18-40088-TSH, 2019 WL 1101283, at \*2 (D. Mass. Mar. 8, 2019) (Hillman, J.) (enforcing arbitration agreement where defendant demonstrated existence of a valid agreement and claims within its scope) (citing *Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011)).  In fact, *after* the Supreme Court handed down *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) (enforcing arbitration agreements with class waivers), Plaintiff's counsel has filed at least 15 individual arbitration demands on behalf of putative class members in the first-filed *Rittmann* case.  Accordingly, there can be no argument by Plaintiff regarding the scope of the arbitration agreement.

Rather, Amazon expects, based on the arguments in *Rittmann*, that Waithaka will argue that the Federal Arbitration Act ("FAA") is inapplicable, and therefore does not require compelling arbitration, on a theory that the local delivery persons here fall within the statute's Transportation Worker Exemption found in Section 1.  9 U.S.C. § 1.  But the narrow language of the Exemption does not encompass a "class of workers" like Delivery Partners, engaged to perform services primarily local and intrastate in nature and who have none of the hallmarks of the classes of transportation workers that Congress excluded from the FAA's coverage.

To interpret the Exemption to encompass couriers like Waithaka, who make local or "last mile" deliveries with a personal vehicle (or even a bicycle or via public transportation), would render the FAA's reference to seamen and railroad employees superfluous and contradict Congress's intent that the "FAA should be read to further, rather than discourage, the use of

arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (FAA embodies "liberal federal policy favoring arbitration.").

Even if the Exemption were to apply, however, that does not answer the arbitrability question. The TOS's choice of law provision designates Washington law as the governing law with respect to all matters not otherwise governed by the FAA, and makes clear that the parties' agreement to arbitrate does not hinge on whether the FAA applies. The arbitration agreement also is enforceable under Washington law, which contains no transportation worker exemption and strongly favors arbitration. And even if Plaintiff were to argue that Massachusetts law should apply in the absence of the FAA, there is no reason the arbitration provision at issue would not be equally enforceable, as written, under Massachusetts law. The result under state or federal law is the same: Waithaka must arbitrate his claims.

In the alternative, if this Court were to deny Amazon's motion to compel, then the Court should transfer Waithaka's claims to the Western District of Washington under the first-to-file rule or, alternatively, under 28 U.S.C. § 1404(a), for consolidation with *Rittmann*. Waithaka and all Delivery Partners are expressly included within the *Rittmann* putative collective. Waithaka's counsel selected Washington federal court to litigate, nationwide, the drivers' alleged misclassification claims and, in fact, Waithaka signed a consent to opt-in to *Rittmann*. *See* Declaration of Elizabeth M. Bresnahan ("Bresnahan Decl.") ¶ 8, Ex. F. Moreover, this case overlaps *Rittmann* in every material way, as evidenced by the instant motion and the fully-briefed motion there, both seeking to enforce the same arbitration agreement under the same legal principles. There is a clear risk of inconsistent rulings and massive inefficiencies for the judiciary and the parties by litigating these cases on parallel tracks. Alternatively, this Court may stay this case pending the disposition of *Rittmann* to reduce inefficiency and the risk of inconsistent rulings.

## II.   STATEMENT OF FACTS

### A.   The Amazon Flex Program

Amazon "is a commercial seller of electronic and consumer goods through its website[.]" ECF No. 1, Ex. A ("Compl.") ¶ 1. Amazon contracts with local courier services and independent contractors like Waithaka to make local deliveries from facilities in Massachusetts. *See* Declaration of Piyush Lumba ("Lumba Decl."), attached as Exhibit B to the Bresnahan Decl., ¶ 4; *see also* Declaration of Rajiv Mashruwala, attached as Exhibit C to the Bresnahan Decl. Delivery Partners are crowdsourced through the Amazon Flex smartphone app. Lumba Decl. ¶ 4. Delivery Partners sign up to participate in Amazon Flex and then use a personal vehicle (or other transportation, such as bicycle or public transportation) to make deliveries. *Id.* ¶¶ 5, 16. Delivery Partners decide when to provide services, and can accept or reject any opportunity offered by Amazon. *Id.* ¶ 17. As its name suggests, Amazon *Flex* does not require Delivery Partners to maintain a regular schedule or minimum frequency of services. *Id.* Delivery Partners are free to provide services to other companies, including Amazon's competitors. *Id.* ¶ 18.

### B.   Amazon Flex Independent Contractor Terms of Service

To sign up for Amazon Flex, Delivery Partners download the Amazon Flex app on a smartphone and accept the Independent Contractor TOS. *Id.* ¶ 5.[1] Individuals can spend as much time as they wish reviewing the TOS before deciding to accept or opt out. *Id.* ¶ 6. Waithaka accepted the TOS on January 13, 2017. Declaration of Peter Nickerson ("Nickerson Decl.") ¶ 6. Page one of the TOS reads in pertinent part:

---

[1]      The TOS is also accessible to Delivery Partners in the Account/View Legal Information section of the Amazon Flex app. *Id.* ¶ 8.

YOU AND AMAZON AGREE TO RESOLVE DISPUTES
BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS
THROUGH **FINAL AND BINDING ARBITRATION**….

Lumba Decl. ¶ 9, Ex. A at 1 (capitalization and emphasis in original).  Section 11, titled "**Dispute**

**Resolution, Submission to Arbitration**," reiterates in multiple capitalized paragraphs the parties'

agreement to resolve disputes in individual arbitration.  *Id.* ¶ 11, Ex. A at 5-6, ¶ 11 (emphasis in

original).  Delivery Partners can "opt out" of arbitration by sending a one-line email during a 14-

day opt-out period, but Waithaka did not do so. *Id.* ¶ 12, Ex. A at 6, ¶ 11(k); Nickerson Decl. ¶¶ 5,

7.  Waithaka twice clicked "I ACCEPT AND AGREE," including specifically to the arbitration

agreement.  Lumba Decl. ¶ 11; Nickerson Decl. ¶ 6.

## III.    PROCEDURAL BACKGROUND

On October 4, 2016, Waithaka's counsel filed *Rittmann*, a putative class and nationwide

collective action against Amazon in the Western District of Washington.  **The *Rittmann* proposed**

**FLSA collective asserts the same misclassification theory alleged in this case and putatively**

**includes Waithaka and all Delivery Partners nationwide**. *See Rittmann*, ECF No. 83

("Rittmann SAC"), attached as Exhibit D to the Bresnahan Decl., at ¶ 10.  Amazon moved to

compel individual arbitration of all Delivery Partners who, like Waithaka, did not opt out of

arbitration.  *Rittmann*, ECF No. 36, attached as Exhibit A to the Bresnahan Decl.  That motion is

awaiting decision.

Like the *Rittmann* plaintiffs, Waithaka alleges that Amazon misclassified Delivery Partners

as independent contractors. Compl.  ¶  2.  Waithaka alleges causes of action under (1) the

Massachusetts Independent Contractor Law; (2) the Massachusetts Wage Act; and (3) the

Massachusetts Minimum Wage Law.  *Id*.  As in *Rittmann*, the Complaint in this case seeks alleged

unpaid wages and unreimbursed business expenses.  *Id*.

## IV.    ARGUMENT

### A.    THE ARBITRATION AGREEMENT IS VALID.

The FAA requires federal courts to compel the arbitration of any claims covered by a valid arbitration agreement. *See e.g., Epic Sys.*, 138 S. Ct. at 1621.  Consistent with our "national policy favoring arbitration," *Preston v. Ferrer*, 552 U.S. 346, 352 (2008), the FAA mandates that arbitration agreements "shall be valid, irrevocable, and enforceable" to the same extent as any contract, and commands that a district court "shall" issue "an order directing the parties to proceed to arbitration in accordance with the terms of [their] agreement."  9 U.S.C. §§ 2, 4.

"A party seeking to compel arbitration under the FAA must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Peterson*, 2019 WL 1101283, at *2 (quoting *Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011)). To determine the validity of online agreements, courts apply the "reasonably communicated and accepted" standard. *Bekele*, 2019 WL 1146759, at *4-5. Here, "the undisputed facts demonstrate that [Amazon] provided [Waithaka] with more than reasonable notice of its arbitration provision, and that [Waithaka] assented to that provision. Accordingly, the parties reached a valid written arbitration agreement." *Bekele*, 199 F. Supp. 3d at 298.  There is no argument that the TOS is in any way unconscionable.  Nor is there any conceivable argument that the wage and hour claims fall outside the broad scope of the arbitration provision, which covers "ANY DISPUTE OR CLAIM … ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT. . . ."  Lumba Decl. Ex. A at 5, ¶ 11.

**B.      THE FAA'S TRANSPORTATION WORKER EXEMPTION DOES NOT APPLY TO LOCAL DELIVERY DRIVERS LIKE WAITHAKA.**

> **1.  The FAA's Language Confirms The Exemption Is Limited To Classes Of Workers Engaged To Perform Work Similar To The Interstate Transportation Work Of Seamen And Railroad Employees.**

Waithaka is left to argue that the FAA does not apply by virtue of the Transportation Worker Exemption.   The Exemption states that the FAA does not "apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  As he is not a seaman or railroad employee, the question here is whether Waithaka fits within the Exemption's "residual clause"—"any other class of workers engaged in . . . interstate commerce."  The answer turns on whether the work (last mile deliveries) and class of workers (last mile delivery drivers) are "similar in nature" to the work and the classes specifically identified in the preceding words of the Exemption (seamen and railroad employees). Explaining the Exemption's narrow wording, the Supreme Court has held the residual clause is "construed to embrace only objects similar in nature" to the "preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (rejecting argument that Exemption embraces contracts of employment of every "class of workers" covered by Section 2).  In other words, the residual clause is "read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be *controlled and defined by reference to the enumerated categories of workers* which are recited just before it."  *Id.* at 115 (emphasis added).

As *Circuit City* explains, the Exemption in Section 1 of the FAA contrasts sharply with the language in Section 2.  Section 2 contains no limiting terms, such as a reference to "seamen" and "railroad employees," and states that the FAA applies to "contract[s] evidencing a transaction involving commerce."  9 U.S.C. § 2.  It is well-settled that the FAA broadly covers transactions touching upon "interstate" commerce, yet Section 2 does not even invoke the word "interstate."

By contrast, Section 1—the Transportation Worker Exemption provision—contains the limiting terms "seamen" and "railroad employees" and focuses not on the underlying contract for service, but on the character of the work and nature of the class of workers.  The Section 2 language permits a looser connection with interstate commerce—the activities need only *involve* commerce in general; the activities in Section 1, by contrast, must *be interstate* commerce and the *class* of workers must be engaged for that purpose similar to seamen and railroad employees.  Plaintiffs' argument begs the question:  Why would Congress make such dramatically different linguistic choices  in sequential statutory sections if it intended the words to mean the same thing?  Clearly, it did not.

The Supreme Court reached exactly that conclusion in *Circuit City*, contrasting Section 2's "more open-ended formulation[]" with the "narrower" wording of Section 1's residual clause. *Circuit City*, 532 U.S. at 118 (citation omitted).  Giving proper effect to Congress's deliberate linguistic choices here means that Section 1's residual clause will apply only if the class is engaged for work that is itself interstate commerce and similar to the classes enumerated in the Exemption. Because short, last-mile package delivery is not itself interstate commerce, and the class of local delivery drivers is not similar to seamen and railroad employees, the Exemption does not apply.

> ### 2.  The FAA's History Confirms That The Exemption Is Limited To Classes Of Workers Who Could Halt The National Transportation Network Through A Labor Strike, Similar To Seamen And Railroad Employees.

Although a worker must "'actually engage' in the transportation of goods in interstate commerce for the [Exemption] to apply," that factor is a "necessary but not sufficient showing for the purposes of the [E]xemption."  *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005).  In addition to proving that he regularly crosses state lines in the ordinary course of performing his work, *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 899 (N.D. Cal. 2018)

(Exemption does not apply where delivery driver did not cross state lines), Waithaka must prove that he belongs to a "'class[]' of transportation workers within the transportation industry" that Congress intended to exempt from the FAA's coverage. *Hill*, 398 F.3d at 1290. Waithaka is not a member of any such class.

As the Supreme Court made clear in *Circuit City*, the Exemption serves a narrow purpose tailored to the distinctive and significant role railroad employees, seamen, and similar classes of workers engaged in interstate commerce perform in our national economy. In the early twentieth century, a series of devastating railroad strikes had crippled the nation's transportation networks. In response, Congress enacted legislation establishing specialized dispute resolution procedures for railroad workers, with the goal of avoiding future labor strife. Similar legislation already existed for seamen and would soon exist for airlines. *Circuit City*, 532 U.S. at 121. Against this backdrop, when Congress enacted the FAA in 1925, it included the Exemption so that private arbitration agreements would not interfere with "prescribed alternative employment dispute resolution regimes" that already applied to the two enumerated classes of workers engaged in long-distance transit and that were expected to apply to similar classes (*e.g.*, airline employees). *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019) (citing *Circuit City supra*). As with seamen and railroad employees, Congress's concern in enacting the residual clause was averting the devastating toll that disruptions in some transportation industries could take on the national economy. *See* Margaret Gadsby, *Strike of the Railroad Shopmen*, MONTHLY LABOR REVIEW, Dec. 1922, at 1, 6.

This history of industry-specific legislation shows that Congress's concern in crafting the Exemption was not with just any transportation activities. Seamen and railroad employees served a vital national function, and Congress wanted to protect the American economy through

regulatory and dispute-resolution schemes tailored to those classes of workers whose mission is the interstate transportation of goods.  As the Eleventh Circuit has explained:

> The emphasis . . . was on a class of workers in the transportation industry, rather than on workers who incidentally transported goods interstate as part of their job in an industry that would otherwise be unregulated. There is no indication that Congress would be any more concerned about the regulation of the interstate transportation activity incidental to [plaintiff's] employment as an account manager, than it would in regulating the interstate "transportation" activities of an interstate traveling pharmaceutical salesman who incidentally delivered products in his travels, or a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town.

*Hill*, 398 F.3d at 1289-90.

The residual clause's "reference to the enumerated categories of workers" means that covered workers must be like seamen and railroad employees.  *Circuit City*, 532 U.S. at 115.  But local delivery drivers are nothing akin to seamen and railroad employees.  In contrast to the labor disruption concerns that animated the Exemption in 1925, a strike by local delivery couriers for a single retailer would not cause the level of economic turmoil that results from strikes by seamen, employees of airlines or railways, or even employees of cross-country trucking fleets.

### 3. The Weight Of Authority Confirms That The Exemption Is Limited To Classes Of Workers Similar To Seamen And Railroad Employees.

Courts consistently reject application of the Exemption to local delivery personnel. These courts adopt the reasoning addressed above that Congress intended the exemption to reach workers who, by virtue of a strike, would "interrupt the free flow of goods to third parties in the same way that a seamen's strike or railroad employee's strike would." *Veliz v. Cintas Corp.*, No. C 03-1180, 2004 WL 2452851, at *8, 10 (N.D. Cal. Apr. 5, 2004) (Exemption did not apply to local delivery drivers).  Here, Waithaka seeks to represent only those Delivery Partners who *work in* Massachusetts. Compl. ¶ 1.  So, Waithaka's own allegations confirm the local character of the services provided and, therefore, undermine the proposition that a strike by a class of local couriers

would disrupt the "interstate transportation of goods—for example, by crippling trucking or shipping lines, air carriers, railroads, seaports, and the like." *Lee v. Postmates Inc.*, No. 18-cv-03421, 2018 WL 6605659, at *7 (N.D. Cal. Dec. 17, 2018) ("A strike by local couriers would presumably have no more effect on interstate commerce than a national strike of, say, cashiers, shelf-stockers, or any number of other classes of employees who are not interstate transportation workers.").[2]  And while in *Rittmann* Plaintiff's counsel made much of the size of Amazon, Waithaka cannot articulate any basis to argue for, or cite any authority to support, the proposition that application of Section 1 depends upon the size of the retailer who sold the goods to be delivered.  Unlike disruptions at ports, train sheds, and airport warehouses, which would affect freight sold by thousands of companies at the same time, a strike by Amazon Flex drivers would affect the customers of a single e-retailer that has numerous other avenues for delivery (*e.g.*, FedEx, UPS, and other local courier services).  Similarly, consumers would be able to fulfill their needs through other e-retailers or by visiting a brick-and-mortar store.  That is a far cry from the national economic impact that a strike of a shipping line, airline, or railroad would cause.

The difference between Waithaka and the discrete classes of transportation workers whom the Exemption covers is further corroborated by the fact that he is not subject to industry-specific

---

[2]      Some cases have conducted a different analysis when facing a different question—namely, whether workers who are a step removed from the actual transportation or delivery fall within the Exemption.  *Compare, e.g.*, *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 352-53 (8th Cir. 2005) (concluding that a "customer service representative" did not fall within the Exemption), *with, e.g.*, *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 590 (3d Cir. 2004) (concluding that a "Field Services Supervisor" did fall within the Exemption).  These courts' analyses of that very different question has no bearing on how to analyze the question here—whether workers engaged in intrastate activities fall within the Exemption—which is readily answered by the statue's plain language, history, and purpose, and the factually apposite caselaw cited above. *See, e.g.*, *Magana*, 343 F. Supp. 3d at 900 (finding *Palcko* inapposite for this reason).  But even if the Court applied such an analysis instead of conducting the simpler inquiry suggested by the statutory text and history, local delivery drivers would not fall within the Exemption. *See, e.g.*, *Lee*, 2018 WL 6605659, at *7.

arbitration legislation that Congress intended to leave undisturbed when it enacted the FAA.  *See Singh v. Uber Techs. Inc.*, 235 F. Supp. 3d 656, 670 (D.N.J. 2017) (holding that drivers were "too far attenuated" from employees to whom the Exemption applies because the drivers were not subject to "special arbitration legislation").  It cannot even be said that all Delivery Partners belong to the same "class" of worker in the way that seamen and railroad employees do.  Some Delivery Partners deliver by car, but others may choose to deliver by other modes of transportation.  *See* Lumba Decl. ¶ 16.  This Court, too, has recognized that Congress intended to distinguish between those identifiable classes of transportation workers who are subject to special procedures for dispute resolution, and those workers who are not:

> According to a report of the American Bar Association, which sponsored the [FAA], there was an objection made on behalf of the Seamen's Union, that seamen's wages come under admiralty jurisdiction and should not be subject to agreements to arbitrate.  When faced with this issue, the drafters of the bill added the exclusionary language for seamen, and for railroad workers, who also had their own special procedures for the resolution of disputes.  In consideration of the foregoing, it seems logical that the drafters "rounded out the exclusionary clause by excluding all other similar classes of workers."

*Scott v. Farm Family Life Ins. Co.*, 827 F. Supp. 76, 78 (D. Mass. 1993) (quoting *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers*, 207 F.2d 450, 452-453 (3d Cir. 1953)).  "Therefore, it is reasonable to find that, in the absence of such legislation, Congress intended for the FAA to apply" to the delivery drivers in this case.  *Singh*, 235 F. Supp. 3d at 671; *see also Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 485 (S.D.N.Y. 2008) (exemption did not apply to drivers because there was "no suggestion that applying the FAA to the Black Car industry would upset any pre-existing or developing statutory scheme" and "[e]xpanding the scope of the residuary exemption" is contrary to the FAA's purpose "to reverse judicial hostility to arbitration" including in the employment context) (citations omitted).  In sum, neither the FAA's history, Supreme Court precedent, nor the decisions of this Court support the position that Congress intended the

Exemption to carve out from the FAA workers like Waithaka who are engaged in unregulated, local delivery services on behalf of consumer retail companies.

### C.    IN THE ALTERNATIVE, WAITHAKA'S CLAIMS SHOULD BE COMPELLED TO ARBITRATION UNDER WASHINGTON LAW.

Even if Waithaka were correct that the Exemption applied in this situation, such a finding would not answer the ultimate question of whether he must arbitrate.  The arbitration agreement expressly invokes not just the FAA, but also "applicable federal law."  Lumba Decl. Ex. A at 6, ¶¶ 11(j), 12.  Neither Congress nor the federal courts have imposed any obstacle to enforcing the parties' mutual agreement to arbitrate, even if not pursuant to the FAA, and Waithaka offers no basis to dash those contractual expectations.  *Volt Info. Sci., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.*, 489 U.S. 468, 470-78 (1989) (Congress did not intend the FAA to occupy entire field of arbitration, and applying state law to parties' agreement did not undermine goals and policies of the FAA). Under applicable federal law, if the FAA does not apply, state arbitration law governs. *Oliveira v. New Prime, Inc.,* 857 F.3d 7, 24 (1st Cir. 2017) (whether Exemption applies "has no impact on other avenues (such as state law) by which a party may compel arbitration"), *aff'd New Prime supra*; *Maldonado v. Sys. Servs. of Am.*, *Inc.*, No. 09-542, 2009 WL 10675793, *2 (C.D. Cal. June 18, 2009) (after finding Exemption applied to truck driver, compelling arbitration under state law); *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 529-30 (S.D.N.Y. 2003) (same).

The arbitration agreement is fully enforceable under Washington law, which has no transportation worker exemption, but does have a "strong presumption in favor of" arbitration. *Marcus & Millichap Real Estate Inc. Servs. v. Yates, Wood & MacDonald, Inc.*, 369 P.3d 503, 510 (Wash. Ct. App. 2016); *see also Peterson*, 2019 WL 1101283, at *3-4 (applying arbitration agreement's Vermont choice of law provision and compelling arbitration of nurse's misclassification and Massachusetts wage and hour claims).

Based on the briefing in *Rittmann*, Amazon expects Waithaka to argue that the Washington Uniform Arbitration Act ("WUAA") does not apply to agreements between employers and employees. But that argument is meritless for several reasons. First, Waithaka expressly agreed to provide services as an *independent contractor*, not an employee. Lumba Decl. Ex. A at 1, ¶ 2. In the context of this motion, the Court cannot reach the question of whether drivers are "employees." *See, e.g.*, *Raytheon Co. v. Donovan*, 208 F. Supp. 2d 99, 104 (D. Mass. 2002) ("'[I]n deciding whether the parties have agreed to arbitration, a court is not to rule on the potential merits of the underlying claims….'") (citation omitted).[3] Second, courts interpreting the WUAA have held that it does *not* bar the arbitration of employment disputes, and that parties remain free to agree contractually to arbitrate employment claims. *See Brooks v. Robert Larson Auto Grp., Inc.*, No. C09-5016, 2009 WL 2853452, at *2 (W.D. Wash. Sept. 1, 2009) ("Plaintiffs' assertion that the [WUAA] excludes employment disputes from arbitration is incorrect . . . There is no prohibition of contractual arbitration of employment disputes."); *see also Bier v. Good Chevrolet, Inc.*, No. 757-33-4-I, 2017 WL 3600567 (Wash. Ct. App. Aug. 21, 2017) (enforcing agreement to arbitrate employment disputes). Under both the FAA and Washington law, the plain reading of the TOS requires Waithaka to arbitrate his claims on an individual basis.[4]

---

[3]     And in contrast to *New Prime*, 139 S. Ct. at 539-40, there is no possible argument that the terms "employment" and "independent contractor" mean the same thing under the WUAA. The same Washington Legislature that enacted the WUAA in 2006 enacted at least five laws which expressly distinguished employees from independent contractors, so it cannot be said that the Legislature included "independent contractors" when it deliberately used the term "employee" in the WUAA. *See* H.B. 2340, 2005-06 Session (Wash. 2006); H.B. 2991, 2005-06; S.B. 5274, 2005-06 Session (Wash. 2005); S.B. 6185, 2005-06 Session (Wash. 2006); S.B. 5309, 2005-06 Session (Wash. 2005); H.B. 2292, 2005-06 Session (Wash. 2006).

[4]     Massachusetts's commitment to arbitration is similarly codified in the Massachusetts Arbitration Act, Mass. Gen. Laws ch. 251 § 1 *et seq*. ("MAA"); *see also Minkina, M.D. v. Frankl*, No. 20091961, 2006 WL 8077081, at *2-3 (Super. Ct. Feb. 14, 2006) (Massachusetts courts give "due regard . . . to federal policy favoring arbitration" and "interpret the underlying policy of [the MAA] as favoring the arbitral forum as an alternative to the judicial forum" (citing *Brennan v.*

**D.    IF THE COURT DOES NOT COMPEL ARBITRATION, IT SHOULD TRANSFER THIS ACTION TO THE *RITTMANN* COURT OR STAY THIS ACTION PENDING DISPOSITION OF *RITTMANN*.**

**1.    The Court Should Transfer This Action Under The First Filed Rule.**

Transfer under the first-filed rule is appropriate where, as here, the two actions are "substantially similar matters as to the parties, underlying facts, claims and requested relief." *Gastineau v. Gifford*, Nos. 11-11096, 11-11312, 2011 WL 4381501, at *1 (D. Mass. Sept. 19, 2011). "It is not necessary to have '100% overlap' or a precise 'mirror image' between two cases to transfer." *Id*. Later-filed actions should be transferred to promote efficiency and judicial economy. *Biolitec, Inc. v. AngioDynamics, Inc.*, 581 F. Supp. 2d 152, 156-57 (D. Mass. 2008).

The earlier-filed *Rittmann* action asserts substantially similar claims against the same defendants and based on an identical theory of liability as the claims in this case. Given this overlap in parties, issues, and allegations, if the Court does not compel Waithaka's claims to individual arbitration, it should transfer this case to the Western District of Washington. Indeed, another federal court already has transferred a later-filed case to be consolidated with *Rittmann*. *See Mack v. Amazon.com, Inc.*, No. 17-02515 (C.D. Cal. Sept. 19, 2017), ECF No. 25, attached as Exhibit G to the Bresnahan Decl.; Order Consolidating Cases (ECF. No. 87) entered in *Rittmann*, attached as Exhibit E to the Bresnahan Decl.

**(i)    The Parties Are Substantially Similar.**

This action and *Rittmann* share identical defendants in Amazon.com, Inc. and Amazon Logistics, Inc. As for plaintiffs, in a class action "it is the class, not the representative, that is

---

*King*, 139 F.3d 258, 264-65 (1st Cir. 1998)). The MAA similarly does not exempt transportation workers. Mass. Gen. Laws ch. 251, § 1. Like the FAA, however, the MAA also seeks to avoid interfering with specialized dispute resolution procedures. *Id*. ("The provisions of this chapter shall not apply to collective bargaining agreements to arbitrate….").

compared." *Weinstein v. Metlife, Inc.*, No. 06-04444, 2006 WL 3201045, at *4 (N.D. Cal. Nov. 6, 2006); *see also Fuller v. Abercrombie & Fitch Stores, Inc.*, 370 F. Supp. 2d 686, 689 (E.D. Tenn. 2005) (finding sufficient overlap where different named plaintiffs held the same positions and suits were against the same defendant).[5]   Waithaka and the members of this putative Massachusetts class are included within the nationwide FLSA collective alleged in *Rittmann*.  *See Fryda v. Takeda Pharm. N. Am., Inc.*, No. 1:11-cv-00339, 2011 WL 1434997, at *5 (N.D. Ohio Apr. 14, 2011) (transferring state-law class action that was a subset of first-filed nationwide FLSA collective).

### (ii)   The Issues And Allegations Are Substantially Similar.

The claims of both Waithaka and the *Rittmann* plaintiffs turn on the same allegation: that "Amazon has misclassified delivery drivers [Delivery Partners] as independent contractors when they are actually employees."  *Compare* Compl. ¶ 2, *with* Rittmann SAC ¶ 2.  In both actions, the plaintiffs claim that Amazon failed to pay minimum wages and reimburse business expenses. *Compare* Compl. Counts II-III, *with* Rittmann SAC Counts I-III, VI-VII.   Many allegations in the Complaint in this case "track[], virtually verbatim, statements from the complaint in the [*Rittmann*] action."  *Wiley*, 667 F. Supp. 2d. at 172 (granting motion to transfer).  Both sets of plaintiffs allege that: Delivery Partners must "pay for many of the expenses necessary to perform their job, including expenses for their vehicles, gas, phone and data plan"; "drivers' hourly wages sometimes fall below the [applicable] minimum wage"; and although "it often takes the drivers more time to complete their deliveries than their scheduled shifts," "drivers do not receive additional compensation for this extra time."  *Compare* Compl. ¶¶ 9-11, *with* Rittmann SAC ¶¶ 22, 24-25.

---

[5]      Having different named plaintiffs in two related class actions does not change the equation. *See, e.g.*, *Wiley v. Gerber Prods. Co.*, 667 F. Supp. 2d 171, 172-73 (D. Mass. 2009) (transferring despite no overlap between the named plaintiffs in the first and second filed actions).

Because the core allegations and issues in this action are identical to those asserted in *Rittmann*, the Court should transfer this case to the Western District of Washington if it does not compel arbitration. *See, e.g.*, *Wiley*, 667 F. Supp. 2d at 172 ("The causes of action are very similar, although the two cases invoke the laws of different states…."); *Biolitec*, 581 F. Supp. 2d at 158 (transferring claims under Massachusetts law to the Northern District of New York after concluding the "essence of Plaintiff's position in the two suits" was substantially similar); *see also Mazzantini v. Rite Aid Corp.*, 829 F. Supp. 2d 9, 11 (D. Mass. 2011) (transferring claims under Massachusetts Wage Act to the Middle District of Pennsylvania, which was "entirely capable of addressing the Massachusetts state law claims").

### 2.   In The Alternative, Transfer Is Appropriate Under 28 U.S.C. § 1404(a).

The many reasons that support transferring this action under the first-to-file rule apply with equal force under 28 U.S.C. § 1404(a), which permits the transfer of litigation from one federal court to another for the "convenience of parties and witnesses, in the interest of justice."  Like the first-filed rule, the purpose of § 1404(a) "is to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotations omitted).  The decision whether to transfer an action pursuant to § 1404(a) is left to the discretion of this Court.  *Pure Distribs., Inc. v. Baker*, No. Civ. 99-412, 2000 WL 1499472, at *1 (D.N.H. May 10, 2000).

Under § 1404(a), courts consider "whether the case 'might have been brought' in the suggested transferee district and, if so, whether convenience and the interest of justice favor transfer."  *Wiley*, 667 F. Supp. 2d at 172.  The following factors are also relevant: (1) "the convenience of the parties and witnesses," (2) "the availability of documents," (3) "the order in which jurisdiction was obtained by the district court," and (4) "the possibilities of consolidation." *Cianbro Corp. v. Curran-Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir. 1987).  As an initial matter,

Waithaka could have brought this action in the Western District of Washington, where Amazon has its principal place of business, and where Plaintiff's counsel previously brought the *Rittmann* action. *Wiley*, 667 F. Supp. 2d at 172. In fact, counsel for Plaintiff originally advised that Waithaka would participate in *Rittmann*. Bresnahan Decl. ¶ 8, Ex. F.

The other factors also weigh strongly in favor of transfer. ***First***, as to convenience, the relevant inquiry is "not whether Massachusetts is [the] more convenient [venue] in the abstract but instead whether sanctioning a second, nearly identical action here is more convenient than transferring the case for the purpose of consolidation." *Wiley*, 667 F. Supp. 2d at 173. Transfer to Washington, where it can be joined with *Rittmann* and another case already transferred there from California, would be substantially more convenient for the many witnesses who otherwise would be forced to testify about similar claims in two separate actions pending at opposite ends of the country. Waithaka's counsel has already filed nearly identical claims, including for Massachusetts Delivery Partners, in the Western District of Washington. *See Gastineau*, 2011 WL 4381501, at *2 ("A transfer will avoid the possibility of divergent, perhaps contradictory, results in these substantially similar cases and prevent duplication of effort on the part of the witnesses and the parties."); *Cook v. E.I. DuPont de Nemours & Co*., No. 3:17-cv-00909, 2017 WL 3315637, at *4 (M.D. Tenn. Aug. 3, 2017) (transferring wage and hour action from Tennessee to Texas: "the fact that the [Tennessee] plaintiffs could choose not to opt in to the Texas action is not relevant"). Absent transfer, duplication of discovery and witness testimony is certain given the substantial similarity of the claims, grounded in the same misclassification theory against the same parties.

***Second***, transfer will also "ease the access to evidence and proof, as there is likely to be substantial overlap in discovery. *King-Scott v. Univ. Med. Pharm. Corp.,* No. 09-cv-0251, 2010 WL 1815431, at *2 (S.D. Cal. May 6, 2010); *see also Pure Distribs.*, 2000 WL 1499472, at *2

(granting motion to transfer where related actions "involve many of the same witnesses and documentary exhibits" and "it would be both inconvenient to those witnesses and an inefficient use of judicial resources to allow substantially similar actions to proceed in different forums").

**Third,** *Rittmann* was filed well before this action, which favors transfer. *Cianbro Corp.*, 814 F.2d at 11.  **Fourth,** the same factors supporting transfer also support consolidating this case with *Rittmann* under Rule 42(a) after transfer. *Wiley*, 667 F. Supp. 2d. at 173 ("[R]elated cases pending in different federal courts may be consolidated in a single district by a transfer of venue [pursuant to 28 U.S.C. § 1404(a)]").  That is precisely what happened after Amazon successfully transferred to the Western District of Washington another duplicative misclassification action filed by Waithaka's counsel in the Central District of California.  *See Mack v. Amazon.Com, Inc.*, No. 17-02515 (C.D. Cal. Sept. 19, 2017), ECF No. 25, attached as Exhibit G to the Bresnahan Decl.; Order Consolidating Cases (ECF. No. 87) entered in *Rittmann*, attached as Exhibit E to the Bresnahan Decl.

Finally, joining this action with *Rittmann* would well serve the "interest of justice," 28 U.S.C. § 1404(a), by promoting the efficient use of judicial resources, avoiding unnecessary waste and expense, and avoiding potentially conflicting judgments. *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that [§] 1404(a) was designed to prevent."); *TPM Holdings, Inc. v. Intra-Gold Indus., Inc.*, 91 F.3d 1, 4 (1st Cir. 1996) ("Obvious concerns arise when actions involving the same parties and similar subject matter are pending in different federal district courts.").

### 3.    In The Alternative, Equity Compels A Stay Of The Instant Action.

Compelling equitable considerations also favor the exercise of this Court's inherent authority to stay this case.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  Plaintiff neither

will suffer prejudice nor be denied his day in court because he already is a putative member of the purported collective action pending in *Rittmann*.  On the other hand, if the Court does not transfer or stay this case, Amazon and two courts will incur the wasteful expense and time demands associated with litigating the same class issues and claims in separate actions with the possibility of inconsistent rulings. *TPM Holdings*, 91 F.3d at 4; *see also Colo. River Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976) (among federal districts, "the general principal is to avoid duplicative litigation"); *Alves v. Prospect Mortg., LLC*, No. 13-10985, 2013 WL 5755465, at *3 (D. Mass. Oct. 22, 2013) (granting motion to stay in FLSA and state wage and hour case "based largely on considerations of judicial economy" and to avoid "wast[ing] time and expense on matters that will then be duplicated by the transferee court"). The policy promoting the elimination of duplicative actions is overwhelmingly applicable here.

## V.        CONCLUSION

Amazon respectfully requests that the Court compel Waithaka's claims to individual arbitration and stay this action or, in the alternative, transfer Waithaka's claims to the Western District of Washington, or stay this action pending the disposition of *Rittmann*.

Dated:  April 2, 2019

**AMAZON.COM, INC. and**
**AMAZON LOGISTICS, INC.,**

By their attorneys,

/s/ *Elizabeth M. Bresnahan*
Douglas T. Schwarz, BBO# 548558
  douglas.schwarz@morganlewis.com
Elizabeth M. Bresnahan, BBO# 672577
  elizabeth.bresnahan@morganlewis.com
Noah J. Kaufman, BBO No. 678968
  noah.kaufman@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA  02110
Tel. (617) 951-8000

## RULE 7.1(A)(2) CERTIFICATION

I, Elizabeth M. Bresnahan, hereby certify on behalf of Defendants that we have in good faith conferred with counsel for Plaintiff in advance of this motion and have attempted in good faith to resolve or narrow the issues raised in this motion. No issues raised in this motion have been resolved or narrowed.

*/s/  Elizabeth M. Bresnahan*
Elizabeth M. Bresnahan

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2019, the foregoing document was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/  Elizabeth M. Bresnahan*
Elizabeth M. Bresnahan
